In The
*Court of Appeals*
*Ninth District of Texas at Beaumont*
NO. 09-25-00345-CV

**CHAD R. DUBOIS, KENNETH D. SIMMONS III,
MONICA BENTZEN, AND LANCE T. MENDOZA, Appellants**

**V.**

**ANESTHESIA ASSOCIATES, Appellee**

On Appeal from the 136th District Court
Jefferson County, Texas
Trial Cause No. 25DCCV1411

**MEMORANDUM OPINION**

This is an accelerated appeal of a temporary injunction pertaining to an employment agreement. Appellants Chad R. Dubois, Kenneth D. Simmons III, Monica Bentzen, and Lance T. Mendoza appeal the trial court's Order granting their former employer Anesthesia Associates' Application for Temporary Injunction. *See* Tex. Civ. Prac. & Rem. Code Ann. § 51.014(a)(4). We overrule the Appellants' issues and affirm the trial court's order granting the temporary injunction.

1

<u>Background</u>

On August 1, 2025, Anesthesia Associates filed Plaintiff's Original Petition, Application for Temporary Restraining Order, and for Temporary Injunction (the "Petition") against Certified Registered Nurse Anesthetists Chad R. Dubois, Kenneth D. Simmons III, Monica Bentzen, and Lance T. Mendoza (the "CRNA Defendants" or "Defendants"). According to the Petition, Anesthesia Associates is a professional association of physicians and healthcare providers providing services to patients, and the CRNA Defendants were employed with Anesthesia Associates until July 31, 2025. Anesthesia Associates alleges that each CRNA Defendant signed an Employment Agreement (the Agreement) with Anesthesia Associates that includes the following provisions:

11.4 Covenant Not to Compete
In consideration of Employer's disclosure to Employee of Confidential and Proprietary Information and the provision of specialized training and knowledge relating to the services to be provided by Employee under this Agreement, Employee hereby covenants and agrees that for a period of three (3) years immediately following the termination of this Agreement and Employee's employment with Employer, Employee shall not, directly or indirectly, in any capacity whatever, practice nursing as a CRNA, or provide CRNA services, at any physician office, hospital, ambulatory surgical center, or other health care facility that is located within a twenty (20) mile radius of each physician office, hospital, ambulatory surgical center, and other health care facility at which Employee provided CRNA services as an employee of Employer at any time during the Employment Period.

11.5 Acknowledgement of Employee

2

Employee acknowledges and agrees that the limitations as to time, geographical area, and scope of activity in Paragraph 11.4 are reasonable limitations, do not impose any restraint on Employee greater than necessary to protect the good will or business interests of Employer, and do not prevent Employee from practicing nursing as a CRNA, or providing CRNA services, at any physician office, hospital, ambulatory surgical center, or any other location outside the twenty-mile area during the three year time period.

11.6   Reformation
If a court determines that any provision of Paragraph 11 is unreasonably broad, limiting, or restrictive, Employee and Employer agree that such provision shall not be declared invalid or unenforceable, but instead shall be modified and reformed by the court to the minimum extent necessary to cause such provision to be valid and enforceable.

. . . .

11.9   Remedies in the Event of Breach
  (a) Employee acknowledges and agrees that any material breach or violation of Employee's promises, agreements, or covenants contained in Paragraph 11 will have an irreparable, material, and adverse effect upon Employer, and that such damages arising from any such breach or violation may be difficult to ascertain. Without limiting any other remedy at law or in equity available to Employer, in the event of any such breach, Employer shall have the right to an immediate temporary restraining order and temporary injunction enjoining Employee's breach or violation, without the need to post any security or bond, as well as all other remedies available at law and in equity;
  (b) Employe[r] and Employee wish to fix in advance, as liquidated damages, the amount of compensation for which Employee shall be liable to Employer in the event of any material breach or violation of Employee's promises, agreements, or covenants contained in Paragraph 11.3 (Non-Disclosure) or Paragraph 11.4 (Covenant Not to Compete). Employe[r] and Employee agree that Employer would suffer harm from any such material breach or violation, but that the amount of such damages is difficult or

3

incapable of estimation. Accordingly, Employer and Employee agree on the following liquated damages, which are their reasonable forecasts of just compensation:

. . .

(ii) In the event of a material breach of violation of Employee's promises, agreements, or covenants contained in Paragraph 11.4, Employee shall pay to Employer $30,000 immediately upon the occurrence of such breach or violation.

Anesthesia Associates alleges that each of the CRNA Defendants resigned from employment with Anesthesia Associates effective July 31, 2025, and accepted employment with a competitor. According to Anesthesia Associates, beginning on or about August 1, 2025, each of the CRNA Defendants performed CRNA services for a competitor of Anesthesia Associates at one or more locations, including CHRISTUS St. Elizabeth Hospital in Beaumont. In the Petition, Anesthesia Associates alleges that each CRNA Defendant violated Section 11.3 of the Agreement and that, under Sections 11.4, 11.5, or 11.9 of the Agreement, Anesthesia Associates is entitled to an immediate Temporary Restraining Order and a subsequent Temporary Injunction, prohibiting each CRNA Defendant from practicing nursing as CRNAs or providing CRNA services anywhere within a twenty-mile radius of the location where the CRNAs worked for Anesthesia Associates. Anesthesia Associates alleges that the CRNA Defendants breached the terms of the Agreement by providing CRNA services in direct competition with Anesthesia Associates within the restricted geographic area, in violation of the non-competition provisions of the Agreement, and that Anesthesia Associates is entitled

4

to $30,000 from each of the CRNA Defendants for liquidated damages under the terms of the Employment Agreement. Anesthesia Associates also requested a temporary restraining order and temporary injunction enjoining the CRNA Defendants from practicing nursing as CRNAs or providing CRNA services as set forth in the Agreement executed by each Defendant.

On August 1, 2025, the trial court signed an Order granting Anesthesia Associates' Application for Temporary Restraining Order and setting a hearing on Anesthesia Associates' Application for Temporary Injunction for August 12, 2025.

On August 6, 2025, CHRISTUS Health Southeast Texas ("CHRISTUS"), the entity that operates medical facilities in Beaumont, including St. Elizabeth Hospital, filed an Original Petition in Intervention asking the trial court "to declare that the restrictive covenants that A[nesthesia] A[ssociates] seeks to enforce should not prohibit the Defendants from providing anesthesia services" to CHRISTUS' facilities in and around Beaumont. CHRISTUS also filed an Emergency Motion to Dissolve the TRO and for Emergency Hearing, and the CRNA Defendants joined the Motion. On August 7, 2025, Anesthesia Associates filed a Motion to Strike Intervenor-Plaintiff CHRISTUS' Petition in Intervention.

<u>Hearing on Motion to Dissolve TRO
and Motion to Strike Intervention</u>

On August 7, 2025, the trial court heard CHRISTUS' Emergency Motion to Dissolve the TRO, as well as Anesthesia Associates' Motion to Strike CHRISTUS'

5

Petition in Intervention, and the trial court received evidence and testimony at the hearing.

Testimony of Tracy Young

Tracy Young, the chief operating officer for Essential Anesthesia Management ("Essential") (which he explained is "[a]lso known as EmergencHealth[]"),[1] testified that the CRNA Defendants contracted with Essential to provide services at St. Elizabeth Hospital in Beaumont. Young testified that at the time of the hearing, Essential had "11 [CRNAs] minus the four [CRNA Defendants] from the TRO[,]" so Essential is continuously trying to find people to fill the CRNA Defendants' shifts. Young oversees scheduling and the internal credentialing at Essential and he testified that, even though Essential is able to pay above market to get CRNAs to travel from other markets, it is difficult to hire CRNAs in a short amount of time because Essential has to locate CRNAs that are not under contract elsewhere and the potential hire must: be licensed in Texas, go through Essential's vetting process, go through the hospital's vetting process, get hospital credentialing, and go through an orientation at the hospital. Young recalled that Essential is committed contractually to have sixteen CRNAs at St. Elizabeth during the

---

[1] In pleadings and in the witnesses' testimony, the names "Essential," "Essential Anesthesia," "Emergenc," and "EmergencHealth" were used interchangeably to refer to the entity that contracted with the CRNA Defendants.

weekday. According to Young, there are approximately 350 CRNAs in Texas that Essential has a relationship with and Essential has "gotten all the ones that we could potentially get, sent them through the credentialing process; and those are the ones that are on the schedule currently [and] no others . . . are available." Young testified that it is highly unlikely for Essential to find CRNAs to cover the CRNA Defendants' shifts within the next several days and that Essential has tried to no avail to get CRNAs from its other facilities to provide services at St. Elizabeth. According to Young, the seven CRNAs, other than the CRNA Defendants, that Essential hired to work at St. Elizabeth have all been asked to work extra shifts, but they are not always able to do so, and Essential cannot force them to work on their days off. Young testified that, including the four CRNA Defendants, Essential is scheduled next week to have thirteen to fifteen CRNAs working, and without the CRNA Defendants, Essential would be down to nine to eleven to work. Young testified that even if the CRNA Defendants were able to work, Essential would not have sixteen CRNAs working, but he agreed Essential would have enough CRNAs to meet the needs of the community. Young estimated that if, hypothetically, the CRNA Defendants were not available to work at St. Elizabeth going forward indefinitely, it would take Essential two or three more weeks to provide necessary coverage to fully staff the hospital. According to Young, the only other CHRISTUS facilities where Essential provides CRNA services are in Corpus Christi and San Antonio, but he noted that

those facilities have their own credentialing. Young testified that in finding CRNAs to come work at St. Elizabeth Beaumont, Essential avoided reaching out to CRNAs working with Anesthesia Associates, but if those employees reached out to Essential or responded to Essential's job postings, then Essential's recruiting team would engage them.

Testimony of Michele Denman

Michele Denman testified that she is the administrative director for perioperative services for CHRISTUS Southeast Texas and she provided an affidavit in this case which is based on her personal knowledge. The affidavit, dated August 6, 2025, the day before the hearing, was admitted as evidence. Her affidavit provided, in relevant part, that the hospital tries to have sixteen CRNAs available on any given day, but from August 6th to August 12th, the CRNA's on the schedule ranged from three to fourteen, and each of the four CRNA Defendants were scheduled on the weekdays. The affidavit stated that the short-term staffing problems present an "imminent threat" to the hospital's ability to operate a Level 3 Trauma Center and provide 24/7 OB coverage. In the affidavit, Denman states, "CHRISTUS Southeast Texas will have to perform roughly 50% fewer surgeries than what we would typically expect on Thursday and Friday. We will then have to perform roughly 50% fewer surgeries than [] we would typically expect on Saturday and Sunday."

8

Denman testified that in her affidavit she had estimated the number of CRNAs available for the day of the hearing that included the CRNA Defendants, but that the CRNA Defendants were not working that day and CHRISTUS Southeast Texas was short-staffed on CRNAs that day. According to Denman, five surgeons were delayed as to surgeries that day, meaning that "surgeons had a posted time . . . and due to not all of the anesthesia that [was] scheduled for being available, those doctors had to follow other doctors . . . . [and] every other surgery after that ha[d] to wait[.]" Denman testified that a minimum number of five surgeries were delayed that day, and she would not know the total number of delayed surgeries until the end of the day. Denman explained that if the CRNA Defendants had been working that day, the scheduled procedures would have started on time, and delays in procedures for one day can roll over to the next day and result in cancellations. Denman testified that she could not schedule CRNAs from another CHRISTUS location such as Jasper or Corpus Christi because those CRNAs are only credentialed for those specific facilities, and credentialing for the purpose of being able to perform work at a particular hospital takes approximately a month unless it is fast-tracked. According to Denman, the CRNA Defendants' absence from work over the next five days impacts CHRISTUS' care to patients because CHRISTUS would not be able to do elective surgeries and emergency surgeries and trauma surgeries would take precedence. Denman testified that the types of elective surgeries for non-life-

9

threatening conditions that would have to be delayed included elective back surgeries, ear tubes and tonsils for children, gallbladder surgeries, and elective hernia surgeries. Depending on the number of births in a given day, the shortage of CRNAs at CHRISTUS St. Elizabeth could also potentially impact care to the maternity ward. Denman stated that on the day of the hearing a gastrointestinal case was delayed because the scheduled CRNA had to first provide anesthesia services to an emergency gastrointestinal bleed case.

On cross-examination, Denman agreed that the contract between St. Elizabeth and Anesthesia Associates required that Anesthesia Associates have sixteen CRNAs to provide services at the hospital, and shortly after the contract had started, Beaumont Bone & Joint and Southeast Texas Gastroenterology disassociated from the hospital. Denman stated that due to the hospital keeping the volume of surgeries up, the demand for the sixteen CRNAs did not decrease. According to Denman, during the week of the hearing, the hospital's main operating room and the outpatient pavilion in West Beaumont had fifty-two procedures serviced by Essential that would have previously been serviced by Anesthesia Associates on that Monday; an estimated fifty procedures on Tuesday, Wednesday, and Thursday; a few less on that Friday; and approximately fifty procedures the following Monday and Tuesday. Although she did not know if any surgeries were canceled for the Monday, Tuesday, or Wednesday before the hearing or on Thursday, the day of the hearing, due to a

10

lack of CRNA coverage, she testified that two surgeries were delayed for that reason. She agreed that for Thursday, the day of the hearing, she had estimated in her affidavit that CHRISTUS would have to cancel twenty-five surgeries due to a lack of anesthesia coverage that day, but that Essential had covered "to fill the holes that were vacated by these four [CRNA Defendants]" and at that time it was possible that zero surgeries would be cancelled for that day. As for Friday, the day following the hearing, Denman testified that she had estimated in her affidavit that thirty-five out of the fifty scheduled surgeries would have to be canceled if there were not enough CRNAs, but that did not happen. According to Denman, six CRNAs were scheduled for that Friday, none of the scheduled surgeries for that Friday were canceled as of the time of the hearing, and there might be no cancellations if Essential could cover the CRNA shifts. As for the weekend, the number of CRNAs CHRISTUS had scheduled and on-call is the minimum necessary, and the normal demand for CRNAs on the weekend is significantly less than during the week.

Denman testified that in a mass casualty situation over the weekend, there would be some on-call CRNAs but, because the CRNA Defendants live in the community and would not be able to work due to the TRO, CHRISTUS would have to get coverage from CRNAs from out of town which might be difficult. Denman agreed that the situation would be the same as if it had occurred prior to the TRO in

11

that in a mass casualty situation all the hospitals work together to provide necessary resources.

Testimony of Dr. Gerald Callas

Dr. Gerald Callas, an anesthesiologist and the president of Anesthesia Associates, testified that it was not Anesthesia Associates' decision to terminate its anesthesia relationship with CHRISTUS. According to Dr. Callas, CHRISTUS negotiated a contract with Anesthesia Associates where Anesthesia Associates needed to maintain a volume of CRNAs but the need for that "volume started dwindling[,]" and Anesthesia Associates could not afford to continue to keep local physicians and CRNAs at the hospital. Dr. Callas testified that CHRISTUS representatives told him that they would work on renegotiating the contract, but that when renegotiation was unsuccessful, Callas canceled the contract effective July 31, 2025, as allowed under the agreement. Dr. Callas agreed that this lawsuit was filed the following day. At that time, Anesthesia Associates was not providing anesthesia services at CHRISTUS, and it had signed a contract to cover anesthesia services at Baptist Hospital. Dr. Callas acknowledged that for at least six months EmergencHealth is now contractually obligated to provide anesthesia services at CHRISTUS, and Anesthesia Associates is not going to provide services during those six months or compete with EmergencHealth for the next six months. According to Dr. Callas, Anesthesia Associates might be competing with EmergencHealth after

12

six months. When asked if Anesthesia Associates was no longer a competitor with EmergencHealth because he had cancelled the contract, Dr. Callas answered, "I canceled the contract, but we're still always competitive."

<u>The Trial Court's Order on the Motion to Dissolve the TRO and the Motion to Strike Petition for Intervention</u>

On August 8, 2025, the trial court signed an Order Modifying Temporary Restraining Order, modifying the August 1, 2025 TRO until the end of the Temporary Injunction Hearing:

> IT IS THEREFORE ORDERED the four individual Defendants may perform services at CHRISTUS Health Southeast Texas facilities if there is a mass trauma event, or if their services are otherwise necessary to a potentially "life or death" situation such that they need to be called in unscheduled.
>
> IT IS THEREFORE ORDERED that two of the four individual Defendants may perform services at CHRISTUS Health Southeast Texas facilities on Monday, August 11, and two may perform services on Tuesday, August 12, in order to avoid disruption or services being delayed. However, the individual Defendants shall be available to testify at the Temporary Injunction Hearing.

The trial court also struck the intervention of CHRISTUS.[2]

---

[2] This Court denied CHRISTUS' Petition for Mandamus relief. *See In re Christus Health Se. Tex.*, No. 09-26-00099-CV, 2026 Tex. App. LEXIS 2322, at *6 (Tex. App.—Beaumont Mar. 12, 2026, orig. proceeding).

On August 12, 2025 and August 13, 2025, the trial court heard testimony and evidence on Anesthesia Associates' Application for Temporary Injunction.

Testimony of Dr. Gerald Callas

Dr. Gerald Callas testified that Anesthesia Associates entered into a negotiated contract with CHRISTUS Health Southeast Texas in 2024, to provide anesthesia services to the hospital. The contract was admitted into evidence. According to the CHRISTUS contract, Anesthesia Associates, in exchange for a monthly stipend from CHRISTUS, agreed to provide anesthesia services at the following CHRISTUS facilities: CHRISTUS Southeast Texas - St. Elizabeth, CHRISTUS Southeast Texas - St. Elizabeth Outpatient Pavilion, and CHRISTUS Southeast Texas – Orthopedic Specialty Center. Dr. Callas explained that the agreement provides that either party could terminate the agreement at any time with or without cause upon 120 days' prior written notice. Dr. Callas testified that a month or two after the agreement was entered into, there was a "nose dive" in the volume of cases needing anesthesia services at CHRISTUS St. Elizabeth and the stipend was no longer adequate to keep the Certified Registered Nurse Anesthetists employed at Anesthesia Associates. Dr. Callas recalled that he provided written notice to the CEO of CHRISTUS Southeast Texas in a letter dated March 31, 2025, wherein he stated that Anesthesia Associates would terminate the contract effective August 1, 2025,

unless a renegotiated agreement was entered into because the current contract did not adequately meet Anesthesia Associates' financial needs. The letter was admitted into evidence. According to Dr. Callas, CHRISTUS Southeast Texas decided it would not renegotiate the contract and instead the hospital contracted with EmergencHealth for CRNA service on July 3, 2025.

Dr. Callas testified that as of March 2025, Anesthesia Associates had fifteen or sixteen "1099" registered nurse anesthetists that were not contracted employees but that "worked under the umbrella of Anesthesia Associates." According to Dr. Callas, the CRNA Defendants then quit Anesthesia Associates and went to work for EmergencHealth, and, because of the CRNA Defendants leaving, Anesthesia Associates only had seven registered nurse anesthetists at the time of the hearing. Dr. Callas recalled that each of the CRNA Defendants had signed an Employment Agreement with Anesthesia Associates. A copy of the Employment Agreements between Anesthesiologist Associates and each of the CRNA Defendants was admitted into evidence. Dr. Callas testified that the CRNA Defendants joined Anesthesia Associates immediately out of school and that Anesthesia Associates worked hard to give them "a lot of our institutional memory and stuff that we thought [was] very important to improve the delivery of anesthesia[]" and make sure they were trained as to "everything from intubation or SLIC techniques, putting in arterial line, [and] using ultrasound[.]" Dr. Callas agreed that each of the CRNA Defendants'

15

Employment Agreements includes: a nondisclosure provision prohibiting the employee from disclosing confidential and proprietary information and acknowledging that the employer's business is competitive and that such a disclosure would adversely affect the employer's business; a covenant not to compete for three years after termination of the Employment Agreement within a twenty-mile radius of any office or facility at which the employee provided CRNA services during the employment period in exchange for the employer's disclosure to the employee of confidential and proprietary information and the provision of specialized training and knowledge; an acknowledgement that the employer has a right to have an immediate temporary restraining order and temporary injunction enjoining the employee's breach or violation without the need to post any security or bond and is entitled to other remedies at law and equity; the employee must pay the employer $30,000 immediately upon breach or violation of the agreement; and that the employer has the right to recover from the employee all reasonable attorney's fees, costs and expenses in any litigation necessary to enforce these provisions. Anesthesia Associates' office is located in the CHRISTUS St. Elizabeth Hospital building in Beaumont.

Dr. Callas testified that the CRNA Defendants could leave Anesthesia Associates at any time. Dr. Callas testified that he was not complaining about the fact that the CRNA Defendants left or quit working for Anesthesia Associates, but

16

that his complaint was that their leaving put a strain on Anesthesia Associates' business and the CRNA Defendants were competing with Anesthesia Associates in Beaumont despite the non-compete clause in their Employment Agreements. Dr. Callas explained that the local university, Lamar University, does not have a CRNA program and that it is difficult to recruit CRNAs to Southeast Texas. He has had to offer incentives to get CRNAs to come to Southeast Texas, including signing bonuses as high as $100,000 to $150,000 or paying travel fees in addition to hourly fees for contract employees living in areas such as Dallas, who would have to travel back and forth to provide anesthesia services. According to Dr. Callas, he can find CRNAs to cover Anesthesia Associates' needs because of the CRNA Defendants leaving, but finding replacements "comes at an exorbitant amount of cost." With respect to the irreparable harm to Anesthesia Associates resulting from the CRNA Defendants leaving and as acknowledged by the Agreements, Dr. Callas described the irreparable harm as:

> Significant harm, irreplaceable damage and harm. First, the amount of morale in the community has totally changed because we are not only mom and pops, we're not only brothers and sisters in this - - in this whole fight, but when you see the fragmentation and the deterioration of a practice that's been here since 1952, it's very concerning and it's - - the community's very upset and appalled.
> The other thing I'll tell you, the morale just with Anesthesia Associates right now, it's very concerning. And then the big thing is that it's cost an arm and a leg for us to continue to try to recruit and try to bring people here.
> We have literally went from being very competitive in the market to where we had to go above and beyond in order to try to keep not only

our local CRNAs here but also try to recruit. Some of - - the package that we went from is that based on the guidelines of the CRNAs, that they recommended that we used to pay based on years of service; and there would be a number. We jumped all that up to 20 years of service. A starting CRNA in our practice right now is $367,550. That is way up more than we've ever done before.

So - - and, also, too, not to talk about the emotional harm that it's caused, the stress that we're dealing with as a - - as a business that we're being threatened because now I'm trying to find bodies in order to keep our business afloat, and we've been around forever. And so it's a huge concern.

Dr. Callas testified that Anesthesia Associates sought a temporary injunction preventing the CRNA Defendants from working within a twenty-mile radius and for a period of three years as outlined in the Agreement. According to Dr. Callas, he has seen surgeries get canceled, but not because of a lack of anesthesia staff, and he was not aware of any canceled surgeries at St. Elizabeth Hospital due to a lack of anesthesia staff in the days leading up to the hearing. Dr. Callas testified that if St. Elizabeth Hospital called him today in a predicament with an emergency and not enough nurse anesthetists, that Anesthesia Associates, as long as not prevented by credentialing or licensing, "would hundred percent help out" just as it did years before when there was a bus crash involving a local school district's students and it was "[a]ll hands . . . on deck."

On cross-examination, Dr. Callas testified that he has no problem with the CRNA Defendants going to work for a competitor outside of the twenty-mile radius. Dr. Callas explained that he had attempted to renegotiate the contract with

CHRISTUS Southeast Texas because "the case volume went down to approximately 38 to 43 percent, that our stipend was based on that volume; and when that volume left, we needed that in order to compensate and to maintain our economic viability as a small business." According to Dr. Callas, after Anesthesia Associates terminated the contract with CHRISTUS Southeast Texas, Anesthesia Associates began providing anesthesia services at Baptist Hospital, along with other facilities such as Altus and Beaumont Surgical Affiliates. Dr. Callas also agreed that for at least six months after CHRISTUS' and Anesthesia Associates' contract terminated, Anesthesia Associates is not going to be competing for the opportunity to provide anesthesiology services at CHRISTUS because Anesthesia Associates is providing services at Baptist Hospital. Dr. Callas also testified that he had "disclosed a lot" to Dubois and Mendoza and "confided in them a lot of the business strategies that [Callas] utilize[s], especially payment, recruiting, [and] compensation." Dr. Callas acknowledged that he was not aware at the time of the hearing if the CRNA Defendants have taken or used Anesthesia Associates' business strategies. He testified that during the prior year the CRNA Defendants, while employed with Anesthesia Associates, had provided anesthesia services at multiple facilities including CHRISTUS, and that the CRNA Defendants worked fifty-to-sixty percent of the time at CHRISTUS Beaumont compared to the other facilities. Dr. Callas explained that when the CRNA Defendants left Anesthesia Associates, it harmed the

community because it gives "a misconception that A[nesthesia] A[ssociates'] brand is somehow falling apart; and, also, people like the idea of having these CRNAs - - us working together as a team because we've been doing it forever." According to Callas, he did not want the CRNA Defendants to leave Anesthesia Associates, but he would not want to force them to work there and, if they did leave, he wanted them to be employed and provide for their family, but not within the twenty-mile radius as provided for in the Employment Agreements. Dr. Callas testified that he agreed that the closest facilities that the CRNA Defendants could provide services outside the twenty-mile radius might be Lake Charles, Louisiana, or Baytown, Texas. Dr. Callas acknowledged that whether the CRNA Defendants work for CHRISTUS Southeast Texas or go out of state, Anesthesia Associates will have to pay more for other CRNAs. Dr. Callas testified that he sent the CRNA Defendants a letter approximately two weeks before August 1, 2025, reminding them of the non-compete clause they agreed to and the consequences if they breached the Agreement. Dr. Callas testified that he wants the CRNA Defendants to honor the contract they signed.

Testimony of Monica Bentzen

Monica Bentzen testified that she currently works for Essential Anesthesia Management which she agreed is "somehow tied in to" EmergencHealth. She agreed she signed her Employment Agreement with Anesthesia Associates on April 6,

2022. She acknowledged that the agreement provided the amount Anesthesia Associates would pay her, that she promised to not disclose confidential and proprietary information material to Anesthesia Associates' goodwill and effective and successful conduct of its business, and that she agreed to a noncompete clause that prohibited her for three years after her employment with Anesthesia Associates from providing CRNA services within a twenty-mile radius of any facility she provided CRNA services during her employment period with Anesthesia Associates. Bentzen agreed that CHRISTUS St. Elizabeth was one of the facilities at which she provided CRNA services while an employee of Anesthesia Associates. Bentzen denied disclosing any of Anesthesia Associates' trade secrets or confidential information.

According to Bentzen, she first talked about going to work for Essential Anesthesia when she spoke with Kyle Holmes, a CRNA that had previously worked for Anesthesia Associates who had taken a position with Essential Anesthesia. Holmes directed her to "Erasmo" who works for Essential Anesthesia, and she spoke to Erasmo over the phone about the noncompete clause in her Employment Agreement with Anesthesia Associates. At that time, she also submitted her resignation to Anesthesia Associates, and she generally discussed her resignation with other CRNAs who had also turned in their resignations to Anesthesia Associates.

Bentzen recalled that because her Employment Agreement with Anesthesia Associates had a provision that required her to pay $30,000 for breaching the noncompete clause, she believed that there was a "buyout" and that "$30,000 would be enough to settle the noncompete clause." She agreed at the hearing that the Employment Agreement does not include the word "buyout" and that the remedies for breach of the noncompete clause include injunctive relief and a liquidated damage clause that requires her to pay $30,000 immediately upon the occurrence of the breach. According to Bentzen, she gave Essential Anesthesia a copy of the Agreement she had signed with Anesthesia Associates, and she was told by Essential Anesthesia that "they would handle" the $30,000, which she understood to mean that Essential Anesthesia "would offer to pay the buyout on [her] behalf." Bentzen testified she also signed a contract with EmergencHealth to start working on August 1, 2025. Bentzen testified that she did not pay Anesthesia Associates the $30,000 when she went to work with Essential Anesthesia (also referred to as "Emergenc"), but that later she believed EmergencHealth or Essential Anesthesia offered Anesthesia Associates the $30,000 on her behalf. Bentzen recalled that while working for Anesthesia Associates, she worked at CHRISTUS in Beaumont "[p]robably more than half[]" the time and she has never been an employee of CHRISTUS. According to Bentzen, when she gave Anesthesia Associates her

22

resignation, Anesthesia Associates did not know where she was going and no one at Anesthesia Associates told her they would sue her.

Bentzen testified that before she had moved back to Texas, her father passed away, and she moved home to take care of her grandmother and her mother who has unique health issues because no one else in Bentzen's family was able to care for her grandmother and mother. At Essential, Betzen earns a base salary of $320,000 as a "W-2 employee[]" and then has the option for "call pay[]" making $750 for a weekday 24-hour call shift and $2,500 for a weekend. She testified she anticipates her total compensation to be approximately $375,000 a year. According to Bentzen, if the trial court were to enter an order that she is no longer able to perform her job at Essential, she would have to leave and find employment elsewhere, most likely back in Pittsburgh where she has contacts and the ability to have a guaranteed job, but where her compensation would be significantly lower at about $165,000 per year and she would have to hire someone to care for her mother and grandmother. Bentzen agreed that there is a shortage of CRNAs and that she could also go to Houston or Lake Charles for employment. She testified that she was not aware if Essential had other facilities and she had not asked anyone at Essential if they had other facilities outside of Beaumont where she could work if she was prohibited from working in Beaumont. Bentzen testified that she has no interest in going back to

23

Anesthesia Associates under any circumstances even though she would make more money there.

Bentzen testified that her noncompete agreement with Essential Anesthesia restricts her from leaving them and working within a one-mile radius and that she also has a separate written agreement with Essential wherein Essential has agreed to cover her legal fees, damages, and expenses in this lawsuit with Anesthesia Associates.

Testimony of Chad Dubois

Chad Dubois testified that prior to July 31, 2025, he was employed by Anesthesia Associates and spent "three-quarters of [his] time[]" working at St. Elizabeth. He testified that in June 2025, he heard from physicians and CRNAs at CHRISTUS St. Elizabeth while working there, that Essential would be taking over the anesthesia services contract at the hospital effective August 1, 2025. Dubois testified that in July of 2025, he had a meeting with Dr. Callas and Dr. Bergeron and asked about the future of Anesthesia Associates. Upon learning at that meeting that Anesthesia Associates did not have answers for how they were going to cover cases and that the CRNAs' workloads would increase, Dubois believed he would be overworked and decided the next day to resign from Anesthesia Associates and go work with Essential. The day after meeting with Dr. Callas, Dubois contacted Erasmo, an Essential employee, and informed Erasmo that he would like a contract

24

with Essential. According to Dubois, Essential sent him a contract and the subject of the noncompete clause in Dubois' Employment Agreement with Anesthesia Associates never came up with Erasmo even though Dubois was aware of the noncompete clause. At the time of the hearing, Dubois stated he is an employee of Essential Anesthesia and performs procedures at CHRISTUS St. Elizabeth Hospital. Dubois explained that Essential was aware of the noncompete clause in his Employment Agreement with Anesthesia Associates because Anesthesia Associates had already had two CRNA employees, Simmons and Mendoza, resign from their employment with Anesthesia Associates and accept a job with Essential. Dubois testified that a statement was made by one of the Essential team members after Dubois resigned from Anesthesia Associates that Essential "would cover [the] buyout[,]" and the statement was made before Dubois' start date with Essential. Dubois denied divulging any trade secrets of Anesthesia Associates, and he denied trying to recruit patients or doctors to move from Baptist Hospital to St. Elizabeth Hospital and he denied trying to convince doctors that Dr. Callas may be recruiting to stay at St. Elizabeth. According to Dubois, he did not knowingly breach the noncompete clause because he knew that Essential was going to "take care of it[,]" but he believed that Essential could do a "buyout" because it was his understanding that a previous Anesthesia Associates' employee, Eric LeBlanc, was able to continue

25

to work in Beaumont after such a "buyout." Dubois had not talked to LeBlanc, and the Essential employees did not ever bring up LeBlanc's name.

Dubois testified that he is from Port Neches, Texas, and he lives in Orange, Texas. He has an eleven-year-old daughter and nine-year-old son. According to Dubois, if the noncompete clause is enforced for three years, his wife who owns a local home health company and their children would have to stay in Southeast Texas and he would have to be "on the road" to have employment. Dubois recalled that Anesthesia Associates was his first job out of CRNA school. He testified that his noncompete agreement with Essential/Emergenc restricts him from leaving and then working as a CRNA within a one-mile radius. He also testified that he has a separate written agreement with Essential/Emergenc wherein Essential/Emergenc agreed to cover his legal fees, damages, and expenses in this lawsuit with Anesthesia Associates.

Testimony of Lance Mendoza

Lance Mendoza testified that he joined Anesthesia Associates in 2017 after he graduated as a CRNA. According to Mendoza, his starting salary was $130,000 but the market has improved for CRNAs, and the salaries are two to three times as much as when he started. He testified that immediately after school he had the requisite knowledge of how to be a CRNA, and he testified he did not receive any specialized training from Anesthesia Associates. Mendoza agreed that on at least

26

one occasion, a patient requested that Mendoza be the CRNA for the patient's scheduled surgery, and Dr. Callas made that accommodation for the patient.

Mendoza testified that in June 2025, he learned that Anesthesia Associates was going to be leaving CHRISTUS St. Elizabeth Hospital, where he had been working about eighty or ninety percent of the time, and he knew that July 31, 2025, would be Anesthesia Associates' last day with CHRISTUS. Mendoza explained that when he signed his contract with Anesthesia Associates, he never considered that Anesthesia Associates would cancel its contract with CHRISTUS, and if he had, he would not have signed the contract. He testified that if Anesthesia Associates was still providing services with CHRISTUS, he would not have left Anesthesia Associates. He did not initially get feedback from St. Elizabeth about who was to replace Anesthesia Associates, and Mendoza e-mailed the information for a job posting with Essential Anesthesia at CHRISTUS in July. He informed the Essential contact that he had a noncompete clause in his agreement with Anesthesia Associates and sent pictures of those pages of the Agreement. According to Mendoza, a lady responded to his e-mail and put him in contact with Erasmo who worked for Essential. When Mendoza spoke to Erasmo for the first time, Erasmo told Mendoza that Essential Anesthesia "would handle" the noncompete clause with Anesthesia Associates. Mendoza recalled that he also entered into an agreement with EmergencHealth, separate from his employment agreement that provided

27

EmergencHealth would pay for his legal fees and any damages assessed against him if Anesthesia Associates sued him for breach of contract.

Mendoza testified that when he received Dr. Callas' letter, he notified someone at EmergencHealth, and EmergencHealth told Mendoza that, "We will handle it." After Mendoza was sued by Anesthesia Associates and an injunction was entered against him, Mendoza contacted Erasmo, who told Mendoza that he "would be in touch with legal."

His current employment contract with EmergencHealth has a noncompete clause prohibiting him from working within a one-mile radius of CHRISTUS, and it states that if they lose the contract from an open bidding process, the noncompete clause is null and void. He could not recall how many years the noncompete clause was effective. With EmergencHealth, Mendoza spends one hundred percent of his time working at CHRISTUS facilities.

Mendoza testified that he lives in Orange, Texas and if he is prohibited from providing services in the Beaumont area for the next three years, he would have to travel for work while his wife and children, ages six and eight, would stay in Orange. According to Mendoza, if he had to work out of town like in Baytown or Lake Charles, he would have to spend an hour-and-a-half on the road on top of his regular shift hours of 7:00 a.m. to 4:00 p.m., he would have to leave before his children awake in the morning and he would not get home until 6:00 p.m. or later, and he

might have to stay at the hospital if he takes a "call shift[.]" Mendoza explained that he wanted the trial court to understand that requiring him to travel that far for work would mean less time with his family, and he wanted the trial court to "[r]ealize that this isn't us against [Anesthesia Associates]. We're doing what's best for our families, what's best for us."

Testimony of Kenneth Simmons

Kenneth Simmons testified that he began working with Anesthesia Associates in 2020, upon his graduation from CRNA school. According to Simmons, as of June 2025, he did not want to quit Anesthesia Associates and did not plan to leave the area because he and his wife have family in the area, and they have two young children. Simmons testified that people generally do not choose where they are getting surgery done based on a specific CRNA they want. Simmons denied that he had received any specialized training from Anesthesia Associates, and he denied having any business secrets or confidential information of Anesthesia Associates' that he uses as an employee of EmergencHealth.

Simmons testified that on July 3, 2025, he was notified in a group message from someone with Anesthesia Associates that the CRNA call requirements would be changing, and he became concerned that with the new call system he was going to have to work more hours. Simmons recalled that he had known of a CRNA job

29

posting from Essential for a while, and had no plans to inquire about that posting until he learned that Essential "was coming in."

According to Simmons, he contacted Erasmo, whose name and phone number were on the Essential job posting, and Simmons informed Erasmo of the noncompete clause in Simmons' employment agreement with Anesthesia Associates. Simmons testified that Essential informed him that they would take care of what was assumed to be a buyout of the noncompete clause. When Simmons received the letter from Anesthesia Associates reminding the CRNAs that they have a noncompete clause in their Employment Agreements, he again brought the noncompete clause to Erasmo's attention and provided a copy of the noncompete clause to Erasmo. Simmons testified that Erasmo responded, "We're taking care of it[]" and "We'll keep you posted." When Simmons found out Anesthesia Associates had filed the lawsuit and a temporary restraining order had been issued, Simmons contacted Erasmo again, and Erasmo stated, "We'll be in touch with our legal team." Simmons recalled that in addition to his employment agreement with Essential, he has a separate written agreement with Essential providing that Essential will cover Simmons' legal fees and damages awarded against Simmons in this lawsuit concerning the noncompete clause with Anesthesia Associates.

Simmons recalled that in his contract with Essential, he negotiated a one-mile radius noncompete clause with no time frame in his employment agreement with

30

Essential when Essential had proposed a five-mile radius noncompete clause, and that it is his understanding of the agreement that it does not provide that he owes a certain amount of money if he breaches the contract. Simmons testified that if Essential presented him with a new contract he would not agree to a noncompete clause with a five-mile radius because he learned from this experience with Anesthesia Associates about signing noncompete agreements. Under his current contract with Essential, Simmons works one hundred percent of his time at EmergencHealth facilities. Simmons signed the contract with Essential on July 11, 2025, and sent a resignation letter to Anesthesia Associates' office manager on July 14, 2025.

According to Simmons, if the noncompete clause with Anesthesia Associates gets enforced and he is prohibited from working in the Beaumont area as a CRNA for the next three years, he would potentially change careers and consider joining his mother's real estate company just to stay in Beaumont. He wants the trial court to "[d]rop this injunction[] [and] allow [him] to work in [his] hometown with [his] family because [he's] not . . . leaving Beaumont."

Testimony of Michele Denman

Michele Denman testified that no cancellations occurred in the days leading up to the hearing, but some surgeries were not scheduled by doctors because of not having enough CRNAs available for CHRISTUS Southeast Texas due to the CRNA

Defendants not being allowed to work as a result of the TRO. According to Denman, without the CRNA Defendants, CHRISTUS Southeast Texas had anywhere from eight to eleven CRNAs scheduled to work each day and that on the day of the hearing, she estimated that two or three surgeries were not scheduled that day solely because there was not going to be a CRNA. According to Denman, she speaks daily with Erasmo Coutino, a CRNA that is on-site and a representative of Essential, about scheduling. Denman testified that she believes that the variation from eight to eleven of CRNAs available to work during this time that CHRISTUS is without the CRNA Defendants due to the TRO is because CRNAs are being asked to work "when they're not supposed to work." Denman testified that the current situation is not sustainable because the CRNAs who are "doing favors and working extra are not going to continue to do that because they have their own jobs [at] other places." Denman explained that CHRISTUS Southeast Texas cannot get CRNAs from other towns to fill the gaps because their credentials do not allow them to go from one hospital to the next, other hospitals do not have surpluses of CRNAs, and the credentialing process usually takes sixty to ninety days. Denman recalled that she had earlier predicted that the Wednesday before the hearing that there would be twenty-five cancellations for the next day on Thursday due to a shortage of CRNAs and there would be thirty-five cancellations on that Friday before the hearing, but she testified that no cancellations happened on either day. Denman agreed

CHRISTUS Southeast Texas was "underscheduling" surgeries to adjust for the situation and that is why the surgeries that were not scheduled due to the CRNA shortage would not show up as "official cancellations[.]" According to Denman, she fields complaints from doctors and others at CHRISTUS about the lack of CRNAs, and she and others are concerned about the ability of the hospital to continue functioning in the best way to serve patients of Southeast Texas without the hospital being able to utilize the four CRNA Defendants. Denman disagreed with Dr. Callas' testimony that there is no evidence of disruption to patient care at CHRISTUS in the days leading up to the hearing due to the CRNA Defendants being unable to work at CHRISTUS, and Denman testified that, "I'm there working every day. [Dr. Callas and his counsel] haven't been in the facility working. So as far as . . . the impacts to patients, they wouldn't be aware of that." Denman acknowledged that she had not communicated "up the Christus chain" to have other CRNAs from Essential Anesthesia fill the spots or to have CHRISTUS CRNAs fill in in Southeast Texas. According to Denman, she would like to have more CRNAs available but she just schedules based on how many CRNAs Erasmo tells her are available.

The First Temporary Injunction Order

On August 20, 2025, the trial court signed a Temporary Injunction restraining the CRNA Defendants from practicing nursing as CRNAs or providing CRNA services anywhere within a twenty-mile radius of where they provided services

33

while employed with Anesthesia Associates, pursuant to the terms of the non-competition agreement the CRNAs executed as part of their Employment Agreements. The CRNA Defendants appealed, but because the trial court issued a temporary injunction without setting a trial date for a trial on the merits as required by Rule 683 of the Texas Rules of Civil Procedure, this Court reversed the trial court's order as void and remanded the case to the trial court. *See Dubois v. Anesthesia Assocs.*, No. 09-25-00302-CV, 2025 Tex. App. LEXIS 7108 (Tex. App.—Beaumont Sept. 4, 2025, no pet.) (mem. op.).[3]

<u>First Amended Petition and Application for Temporary Injunction</u>

Anesthesia Associates filed a First Amended Petition and Application for Temporary Injunction, stating that "Plaintiff Anesthesia Associates Group, PLLC d/b/a Anesthesia Associates is a PLLC doing business in Jefferson County, Texas[,]" and Anesthesia Associates added an allegation that it "has demonstrated the existence of a cause of action or other claim for permanent relief against Defendants[.]" Anesthesia Associates also filed a Motion for Entry of Order with an attached proposed order tracking the language of the prior Order granting a

---

[3] This Court also noted that the order set a hearing on Anesthesia Associates' application for permanent injunction, but the Petition did not seek a permanent injunction as relief. *See Dubois v. Anesthesia Assocs.*, No. 09-25-00302-CV, 2025 Tex. App. LEXIS 7108, at *3 (Tex. App.—Beaumont Sept. 4, 2025, no pet.) (mem. op.).

Temporary Injunction, but that also included a trial setting for the entire case on the merits for June 8, 2026.

Second Temporary Injunction Order

On September 12, 2025, the trial court signed a second Temporary Injunction Order (the Second Temporary Injunction Order) granting Anesthesia Associates' application for a temporary injunction "[b]ased on the arguments and evidence received during the hearings on August 7, 12 and 13, 2025[.]" The Second Temporary Injunction Order included a trial setting on the merits for the entire case setting it for June 8, 2026, and it included the findings set forth in the trial court's letter ruling attached as an exhibit. In the Second Temporary Injunction Order, the trial court included the following findings[4] from the letter ruling:

> The Court finds that the covenants to compete signed by Defendants are valid and enforceable, in that each was ancillary to an otherwise enforceable agreement at the time it was made; and that each covenant contains reasonable limitations as to time, geographical area, and scope of activity to be restrained that do not impose a greater restraint than is necessary to protect the goodwill or other business interests of the promisee—in this case, Plaintiff. The Court finds that the terms are reasonable with respect to time (3 years), geographical area (20-mile radius of an AA office), and scope (practicing as a CRNA), and do not impose a greater restraint than necessary to protect the goodwill and business interests of AA.

---

[4] If the trial court decides to grant an injunction, Rule 683 of the Texas Rules of Civil Procedure states that the order "shall set forth the reasons for its issuance; shall be specific in terms; shall describe in reasonable detail and not by reference to the complaint or other document, the act or acts sought to be restrained[.]" Tex. R. Civ. P. 683.

The Court further finds that the agreements were properly supported by consideration in light of the goodwill received by Defendants by virtue of their employment at AA. In order to work as a CRNA at the Beaumont Christus facilities, Defendants were required to be supervised and work underneath the anesthesiologist physicians at AA. The employment with AA provided Defendants with the credentialing needed to practice at St. Elizabeth Hospital, and access to other surgeons, hospital staff, and hospital administrators as they helped fulfill the anesthesiology needs of that medical facility. Moreover, it was the existing credentialing that made Defendants such ideal targets for hire by non-party EmergencHealth because it provided a fast-track means for EmergencHealth to fulfill its own contractual obligations to Christus St. Elizabeth.

The Court further finds that Plaintiff has demonstrated the existence of a cause of action or other claim for permanent relief against Defendants; a probable right to the permanent relief, i.e., a determination that the covenant was enforceable and that a breach occurred; and that there is a probable, imminent and irreparable injury before trial with no adequate remedy at law. The Court finds that the legal remedy of damages does not offer complete relief because damages cannot protect Plaintiff against future competition by Defendants. In addition, the Court finds that damages caused by loss of business, use of trade secrets, and the like cannot readily be determined with sufficient certainty for damages to be an adequate remedy.

In the present case, Plaintiff has alleged a cause of action for breach of contract in its pleadings, which satisfies the first requirement outlined above. Second, the Court has previously determined that the covenants not to compete are enforceable, and that each Defendant conceded in their own testimony that their employment with non-party EmergencHealth at St. Elizabeth Hospital in Beaumont was a violation of the terms of their non-compete agreement.

The Court notes that irreparable injury to a promisee sufficient to support the necessity of equitable relief is frequently presumed from the fact of breach, and evidence of a breach by a highly trained employee, such as the Defendants herein, constitutes prima facie proof of irreparable injury to the former employer. In the present case, the undisputed testimony has established that the CRNAs are highly trained, highly skilled, in high demand, and are extremely hard to replace when a vacancy arises. Furthermore, if the non-compete clauses were not enforced, Plaintiff would face the possibility of losing

36

additional CRNAs to competitors, which could render Plaintiff unable to fulfill its own ongoing contractual anesthesia requirements to other medical facilities, or could even result in the practice having to close or relocate altogether. The Court finds that the scarcity of CRNA medical professionals and the consequence of losing those professionals could result in permanent and irreparable damage to Plaintiff and the viability of its business.

The Court finds that the acts of the CRNA Defendants in violation of their covenants not to compete have been carried out, and will be carried out, before the Court can render judgment in this case if a Temporary Injunction is not entered, and the Court further finds that the continuing of these acts will tend to make ineffectual a future Judgment or Permanent Injunction in favor of Plaintiff.

The CRNA Defendants filed this appeal.[5]

## Issue on Appeal

On appeal, the CRNA Defendants argue that the trial court should reverse the Second Temporary Injunction Order because Anesthesia Associates did not meet the requirements for a temporary injunction for three independent reasons: it has no legitimate business interest in restraining the CRNA Defendants from working at CHRISTUS St. Elizabeth Hospital, there is no irreparable harm and damages are an

---

[5] After the CRNA Defendants filed this appeal, the CRNA Defendants also filed a Motion for Temporary Order Staying Second Temporary Injunction Pending Appeal Based on New Evidence. On January 13, 2026, this Court issued an Order denying the CRNA Defendants' motion for temporary relief. *See* Tex. R. App. P. 29.3 ("the appellate court must not suspend the trial court's order if the appellant's rights would be adequately protected by supersedeas or another order made under Rule 24"). To the extent that the parties discuss in their appellate briefs what they call "new evidence," we note that our review on appeal is limited to the validity of the second temporary injunction order, wherein the trial court's order was "[b]ased on the arguments and evidence received during the hearings on August 7, 12 and 13, 2025[.]"

adequate remedy, and the balance of equities weighs strongly in the CRNA Defendants' favor.[6] According to the CRNA Defendants, Anesthesia Associates has no legitimate interest in restraining them from working at the St. Elizabeth Hospital because Anesthesia Associates terminated its anesthesia contract with St. Elizabeth Hospital and admitted it will not compete for St. Elizabeth's business for at least six months. The CRNA Defendants argue that because Anesthesia Associates admitted it can hire other CRNAs at an additional cost, there is no irreparable harm, and damages are an adequate remedy. As for balancing the equities of the parties, the CRNA Defendants assert that Anesthesia Associates will suffer little, if any, harm because it voluntarily terminated its anesthesia contract with St. Elizabeth Hospital and admitted it will not compete for St. Elizabeth's business for at least six months.

---

[6] In the "Statement Regarding Oral Argument" section of the CRNA Defendants' appellate brief, they assert the following:

This case presents an important issue in non-compete law:

Can a company that voluntarily terminated its contract with a customer—and swore it would not compete for that customer's business for at least six months—prohibit its former employee from continuing to work at that customer's business for a new employer?

We note that the CRNA Defendants did not argue in the trial court that the temporary injunction is improper because the employees would be working for the "same customer" but for a "new employer." Accordingly, the CRNA Defendants failed to preserve this complaint. *See* Tex. R. App. P. 33.1(a)(1) (a party's argument on appeal must comport with its argument in the trial court to preserve error).

Anesthesia Associates argues that it has a legitimate business interest in restraining the CRNA Defendants from working at CHRISTUS St. Elizabeth Hospital because Anesthesia Associates' contract with Baptist Hospital does not prevent Anesthesia Associates from providing services elsewhere and that Dr. Callas testified that he would, if called upon by St. Elizabeth Hospital, provide services there. According to Anesthesia Associates, Dr. Callas' testimony does not support the idea that Anesthesia Associates is "boycotting" St. Elizabeth Hospital, and that Dr. Callas only made a logical assumption that it would be unlikely for Anesthesia Associates to get St. Elizabeth's business for six months because the hospital had a six-month contract with EmergencHealth. Anesthesia Associates also emphasizes that the covenant not to compete lasts for three years – which leaves more than two and a half years for the covenant not to compete to apply even after the six-month contract period between St. Elizabeth and EmergencHealth expired on February 1, 2026. Anesthesia Associates cites to several Texas cases[7] in arguing that goodwill, specialized training, and a company's interest in not having its employees poached are legitimate business interests worthy of protection by a covenant not to compete.

---

[7] *Marsh USA, Inc. v. Cook*, 354 S.W.3d 764, 769 (Tex. 2011); *Smith v. Nerium Int'l, LLC*, No. 05-18-00617-CV, 2019 Tex. App. LEXIS 6741, at **15-16 (Tex. App.—Dallas Aug. 5, 2019, no pet.) (mem. op); *Orbison v. Ma-Tex Rope Co.*, 553 S.W.3d 17, 43 (Tex. App.—Texarkana 2018, pet. denied); *Neurodiagnostic Tex, L.L.C. v. Pierce*, 506 S.W.3d 153, 164 (Tex. App.—Tyler 2016, no pet.).

As for irreparable harm, Anesthesia Associates argues that its live Petition includes the language of the Employment Agreements wherein the CRNA Defendants agreed that a material breach of the noncompete clause would result in "irreparable, material, and adverse effect" on Anesthesia Associates. Anesthesia Associates also asserts it has proven irreparable harm because a breach of a covenant not to compete is the "epitome" of irreparable harm, and Dr. Callas' testimony provides sufficient evidence of irreparable harm supporting the trial court's exercise of its discretion in granting the temporary injunction.

Standard of Review

"A temporary injunction is an extraordinary remedy and does not issue as a matter of right." *Abbott v. Anti-Defamation League Austin, Sw., & Texoma Regions*, 610 S.W.3d 911, 916 (Tex. 2020) (quoting *Walling v. Metcalfe*, 863 S.W.2d 56, 57 (Tex. 1993)). Such an injunction functions "to preserve the status quo of the litigation's subject matter pending a trial on the merits." *Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 204 (Tex. 2002) (op. on reh'g) (citing *Walling*, 863 S.W.2d at 57). "To obtain a temporary injunction, the applicant must plead and prove three specific elements: (1) a cause of action against the defendant; (2) a probable right to the relief sought; and (3) a probable, imminent, and irreparable injury in the interim." *Id.* Because the temporary injunction only preserves the status quo pending final trial, the trial court's determination regarding whether to issue the temporary injunction

40

does not resolve the ultimate merits of the suit. *Brooks v. Expo Chem. Co.*, 576 S.W.2d 369, 370 (Tex. 1979) (explaining that appellate review does not include "the merits of the underlying case" but is "strictly limited to a determination of whether there has been a clear abuse of discretion by the trial court in determining whether the applicant is entitled to a preservation of the status quo pending trial on the merits[]"). The assumption is that the evidence may well change between the preliminary temporary-injunction stage of the proceeding and a final trial on the merits. *Davis v. Huey*, 571 S.W.2d 859, 862 (Tex. 1978). Thus, the probability-of-success requirement does not require an applicant to show that it will prevail at final trial. *Walling*, 863 S.W.2d at 58. For purposes of a temporary injunction, "[a]n injury is irreparable if the injured party cannot be adequately compensated in damages or if the damages cannot be measured by any certain pecuniary standard." *Butnaru*, 84 S.W.3d at 204. "An application for injunction is a request that a court exercise its equitable jurisdiction, and in exercising that power the court balances competing equities." *NMTC Corp. v. Conarroe*, 99 S.W.3d 865, 868 (Tex. App.—Beaumont 2003, no pet.) (citing *In re Gamble*, 71 S.W.3d 313, 317 (Tex. 2002)).

In deciding whether to grant or deny an application for a temporary injunction, trial courts are given discretion. *Butnaru*, 84 S.W.3d at 204 (citing *Walling*, 863 S.W.2d at 58). "A reviewing court should reverse an order granting injunctive relief only if the trial court abused that discretion." *Id.* The reviewing court may not

substitute its judgment for that of the trial court unless the trial court's action was so arbitrary that it exceeded the bounds of reasonable discretion. *Id.* Our abuse-of-discretion review requires that we view the evidence in the light most favorable to the trial court's order and that we indulge every reasonable inference in its favor. *See Thomas v. Beaumont Heritage Soc'y*, 296 S.W.3d 350, 352 (Tex. App.—Beaumont 2009, no pet.). Our review is confined to the validity of the order. *Id.* Also, "[w]hen the trial court embeds findings of fact and conclusions of law in its order denying a temporary injunction, the findings and conclusions may be helpful in determining whether the trial court exercised its discretion in a principled fashion[;] however, they are not binding on this court." *Communicon, Ltd. v. Guy Brown Fire & Safety, Inc.*, No. 02-17-00330-CV, 2018 Tex. App. LEXIS 2055, at *17 (Tex. App.—Fort Worth Mar. 22, 2018, no pet.) (mem. op.) (citing *Tom James of Dallas, Inc. v. Cobb*, 109 S.W.3d 877, 884 (Tex. App.—Dallas 2003, no pet.)). "An abuse of discretion does not exist where the trial court bases its decisions on conflicting evidence." *Davis*, 571 S.W.2d at 862. If the trial court must resolve a conflict in the evidence, its resolution of a fact issue is one to which we must defer. *Wright v. Sport Supply Grp., Inc.*, 137 S.W.3d 289, 292 (Tex. App.—Beaumont 2004, no pet.).

We first address the CRNA Defendants' argument that Anesthesia Associates is not entitled to a temporary injunction because it has failed to show it has a

42

legitimate business interest in restraining the CRNA Defendants from working at CHRISTUS St. Elizabeth because Anesthesia Associates voluntarily terminated its anesthesia contract with that hospital and admitted it would not compete for the CHRISTUS St. Elizabeth's business for at least six months. The trial court heard Dr. Callas' testimony that he had hoped to renegotiate Anesthesia Associates' contract with CHRISTUS but that CHRISTUS decided not to renegotiate, and that Anesthesia Associates would still assist at CHRISTUS St. Elizabeth in an emergency scenario. The trial court heard Dr. Callas testify that for at least six months Anesthesia Associates is not going to be competing for the opportunity to provide anesthesiology services at CHRISTUS because Anesthesia Associates is providing services at Baptist Hospital. The trial court also heard testimony that CHRISTUS had a six-month contract with Essential or EmergencHealth, a competitor of Anesthesia Associates. Dr. Callas testified that Anesthesia Associates might be competing with EmergencHealth after six months, and when asked if Anesthesia Associates was no longer a competitor with EmergencHealth because he had cancelled the contract, Dr. Callas answered, "I canceled the contract, but we're still always competitive." Further, the evidence submitted at the hearing showed that the Agreements signed by the CRNA Defendants stated that the noncompete clause prevented them from working within 20 miles of where they had worked for Anesthesia Associates for a period of three years. The trial court heard Dr. Callas

43

testify that he provided the CRNA Defendants with valuable training and experience when they joined Anesthesia Associates directly out of school and that Anesthesia Associates "gave them a lot of our institutional memory . . . important to improve the delivery of anesthesia[,]" and that he "disclosed a lot" to Dubois and Mendoza and "confided in them a lot of the business strategies that [Callas] utilize[s], especially payment, recruiting, [and] compensation." *See Smith v. Nerium Int'l, LLC*, No. 05-18-00617-CV, 2019 Tex. App. LEXIS 6741, at *12 (Tex. App.—Dallas Aug. 5, 2019, no pet.) (mem. op) ("'Business goodwill, confidential or proprietary information, trade secrets, customer information, and specialized training are examples of interests that can be, in appropriate circumstances, worthy of protection by a covenant not to compete.'") (quoting *Neurodiagnostic Tex, L.L.C. v. Pierce*, 506 S.W.3d 153, 164 (Tex. App.—Tyler 2016, no pet.)). Viewing all the evidence in the light most favorable to the trial court's order, the trial court could have reasonably determined that Anesthesia Associates demonstrated that it had a legitimate business interest in restraining the CRNA Defendants from working at CHRISTUS St. Elizabeth in Beaumont.

Next, we address the CRNA Defendants' argument that Anesthesia Associates is not entitled to a temporary injunction because it has failed to show there is irreparable harm, and damages are an adequate remedy. "'An injury is irreparable if the injured party cannot be adequately compensated in damages or if

the damages cannot be measured by any certain pecuniary standard.'" *Poole v. U.S. Money Reserve, Inc.*, No. 09-08-137 CV, 2008 Tex. App. LEXIS 8257, at *30 (Tex. App.—Beaumont Oct. 30, 2008, no pet.) (mem. op.) (quoting *Butnaru*, 84 S.W.3d at 204). "Damages are inadequate, so as to support a temporary injunction, if they are difficult to calculate." *Id.* at **30-31 (citing *Rollins v. Universal Coin & Bullion Ltd.*, No. 09-06-150 CV, 2006 Tex. App. LEXIS 8764, at *13 (Tex. App.—Beaumont Oct. 12, 2006, no pet.) (mem. op.).

Anesthesia Associates notes in its Petition that each CRNA Defendant agreed in their Employment Agreements that a breach of the noncompete clause would cause Anesthesia Associates "an irreparable, material, and adverse effect . . . and that such damages arising from any such breach or violation may be difficult to ascertain." The CRNA Defendants contend that Anesthesia Associates cannot rely on this Court's opinion in *Dickerson v. Acadian Cypress & Hardwoods, Inc.*, No. 09-13-00299-CV, 2014 Tex. App. LEXIS 3889, at **16-17 (Tex. App.—Beaumont Apr. 10, 2014, no pet.) (mem. op.), in claiming that Anesthesia Associates does not have to prove irreparable injury. The CRNA Defendants argue that a parties' contractual stipulation of irreparable injury is not binding on courts. The CRNA Defendants maintain that two of our sister courts have rejected the argument that a contractual stipulation of irreparable injury is binding on courts and, by itself, the

45

contractual stipulation is insufficient to support injunctive relief.[8] Anesthesia Associates argues that a trial court can properly consider as evidence an employee's agreement that the employer lacks an adequate remedy and irreparable harm, which is entirely consistent with our opinion in *Dickerson*. *See* 2014 Tex. App. LEXIS 3889, at **16-17.

This Court has previously explained in other cases that the language of a parties' agreement is one factor that the trial court can consider, along with the entire record, in determining the reasonableness of a covenant in an employment agreement, and this reasoning is consistent with other courts who have determined that the agreement is some evidence to consider when analyzing covenants containing similar acknowledgements. *See id.* at **16-17; *Poole*, 2008 Tex. App. LEXIS 8257, at **23-24 & n.5.

---

[8] Citing *W.R. Grace & Co.–Conn v. Taylor*, No. 14-06-01056-CV, 2007 Tex. App. LEXIS 3779, at *7 n.7 (Tex. App.—Houston [14th Dist.] May 17, 2007, no pet.) (mem. op.); *Sec. Telecom Corp. v. Meziere*, No. 05-95-01360-CV, 1996 Tex. App. LEXIS 806, at *6 (Tex. App.—Dallas Feb. 28, 1996, no writ) (not designated for publication). We note that the CRNA Defendants also cite to some out-of-state authorities in support of their argument that federal courts have also rejected the same argument. We find these cases distinguishable on their facts. That said, even assuming without deciding that the cases are factually analogous, we are not bound to follow them. *See Penrod Drilling Corp. v. Williams*, 868 S.W.2d 294, 296 (Tex. 1993) (explaining that while other federal or state court opinions might be persuasive authority, we "are *obligated* to follow only higher Texas courts and the United States Supreme Court[]").

Also, there is a rebuttable presumption that an employer is suffering irreparable injury when the employer produces some evidence that a highly-trained employee is engaging in conduct of a continual breach of his or her covenant not to compete. *Cardinal Health Staffing Network, Inc. v. Bowen*, 106 S.W.3d 230, 236 (Tex. App.—Houston [1st Dist.] 2003, no pet.) (citing *Unitel Corp. v. Decker*, 731 S.W.2d 636, 641 (Tex. App.—Houston [14th Dist.] 1987, no writ); *Martin v. Linen Sys. For Hosps., Inc.*, 671 S.W.2d 706, 709 (Tex. App.—Houston [1st Dist.] 1984, no writ); *Hartwell's Office World, Inc. v. Systex Corp.*, 598 S.W.2d 636, 639 (Tex. App.—Houston [14th Dist.] 1980, writ ref'd n.r.e.)). The trial court could have reasonably concluded from the testimony at the hearings that the CRNAs each knew they were breaching the noncompetition clause of their respective Employment Agreements with Anesthesia Associates when they resigned and began working with EmergencHealth. The CRNA Defendants testified they knew they had a noncompetition agreement with a twenty-mile radius for three years, but each CRNA Defendant had been told by their new employer that the new employer would take care of paying all damages caused from their breach of the Agreement. Accordingly, the trial court reasonably could have applied a presumption of irreparable injury. *Id*. Dr. Callas also explained that the local university, Lamar University, does not have a CRNA program and that it is difficult to recruit CRNAs to Southeast Texas. He testified he has had to offer incentives to get CRNAs to come to Southeast Texas,

including signing bonuses as high as $100,000 to $150,000 or paying travel fees in addition to hourly fees for contract employees living in areas such as Dallas, who would have to travel back and forth to provide anesthesia services. According to Dr. Callas, this has affected Anesthesia Associates' "good will[,]" and finding replacements "comes at an exorbitant amount of cost." "Damages attributable to a former employee's competition and appropriation of goodwill can be difficult to calculate." *Equine Sports Med. & Surgery Weatherford Div., PLLC v. Tipton*, No. 02-19-00346-CV, 2020 Tex. App. LEXIS 8343, at *14 (Tex. App.—Fort Worth Oct. 22, 2020, no pet.) (mem. op.) (citing *Tranter, Inc. v. Liss*, No. 02-13-00167-CV, 2014 Tex. App. LEXIS 3398, at **27-28 (Tex. App.—Fort Worth Mar. 27, 2014, no pet.) (mem. op.) (noting that "[i]n Texas, injury resulting from the breach of non-compete covenants is the epitome of irreparable injury") (quoting *Daily Instruments Corp. v. Heidt*, 998 F.Supp. 2d 553, 569 (S.D. Tex. 2014))). Assigning a dollar amount to intangibles such as loss of goodwill and office stability is challenging. *Frequent Flyer Depot, Inc. v. Am. Airlines, Inc.*, 281 S.W.3d 215, 228 (Tex. App.—Fort Worth 2009, pet. denied). In testifying to the irreparable harm incurred by Anesthesia Associates resulting from the CRNA Defendants leaving and working in Beaumont for a competitor, Dr. Callas described the irreparable harm as:

> Significant harm, irreplaceable damage and harm. First, the amount of morale in the community has totally changed because we are not only mom and pops, we're not only brothers and sisters in this - - in this whole fight, but when you see the fragmentation and the

48

deterioration of a practice that's been here since 1952, it's very concerning and it's - - the community's very upset and appalled.

The other thing I'll tell you, the morale just with Anesthesia Associates right now, it's very concerning. And then the big thing is that it's cost an arm and a leg for us to continue to try to recruit and try to bring people here.

We have literally went from being very competitive in the market to where we had to go above and beyond in order to try to keep not only our local CRNAs here but also try to recruit. Some of - - the package that we went from is that based on the guidelines of the CRNAs, that they recommended that we used to pay based on years of service; and there would be a number. We jumped all that up to 20 years of service. A starting CRNA in our practice right now is $367,550. That is way up more than we've ever done before.

So - - and, also, too, not to talk about the emotional harm that it's caused, the stress that we're dealing with as a - - as a business that we're being threatened because now I'm trying to find bodies in order to keep our business afloat, and we've been around forever. And so it's a huge concern.

Dr. Callas also explained that when the CRNA Defendants left Anesthesia Associates it harmed the community because it gives "a misconception that A[nesthesia] A[ssociates'] brand is somehow falling apart; and, also, people like the idea of having these CRNAs - - us working together as a team because we've been doing it forever."

On this record, considering the language of the Employment Agreements, the CRNA Defendants' acknowledgment of their breach of the noncompete provisions, the rebuttable presumption of irreparable harm, along with Dr. Callas' testimony as to the irreparable harm to Anesthesia Associates caused by the CRNA Defendants leaving Anesthesia Associates to work for EmergencHealth, we cannot say that the

49

trial court's action was so arbitrary that it exceeded the bounds of reasonable discretion in finding that Anesthesia Associates, prior to trial, had no adequate remedy at law and would suffer an irreparable injury in the interim. *See Butnaru*, 84 S.W.3d at 204.

Last, we address the CRNA Defendants' contention that in balancing the equities of the parties, Anesthesia Associates will suffer little, if any, harm because it voluntarily terminated its anesthesia contract with CHRISTUS St. Elizabeth Hospital in Beaumont and admitted it will not compete for that business for at least six months. "In balancing equities, a trial court may consider whether the degree of injury to the applicant would be slight or significant if the temporary injunction were erroneously denied, and whether the injury to the opposing party would be slight or significant if the temporary injunction were erroneously granted." *NMTC Corp.*, 99 S.W.3d at 869 (citing *Universal Health Servs., Inc. v. Thompson*, 24 S.W.3d 570, 578 (Tex. App.—Austin 2000, no pet.)). Based on the evidence before the trial court, we cannot say the trial court abused its discretion in balancing the equities and finding that the equities weighed in Anesthesia Associates' favor.

Viewing the evidence in the light most favorable to the trial court's order and indulging every reasonable inference in its favor, as we must, we cannot conclude that the trial court abused its discretion in granting Anesthesia Associates' application for temporary injunction against the CRNA Defendants. *See Thomas*,

50

296 S.W.3d at 352. We overrule the CRNA Defendants' issue on appeal, and we affirm the trial court's order granting Anesthesia Associates a temporary injunction against the CRNA Defendants.

AFFIRMED.

LEANNE JOHNSON
Justice

Submitted on February 19, 2026
Opinion Delivered April 16, 2026

Before Golemon, C.J., Johnson and Wright, JJ.